**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| HEATHER CURRAN, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 8:24-cv-00402-AAQ |
| MOM'S ORGANIC MARKET, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |

******

**MEMORANDUM OPINION AND ORDER**

This is a case concerning a grocery store's alleged discrimination against one of its former employees because she is not Hispanic. Plaintiff Heather Curran, a non-Hispanic white woman, alleges that Defendants MOM's Organic Market ("MOM's") and Reina Hernandez discriminated against her and created a hostile work environment during her employment at MOM's, in violation of 42 U.S.C. § 1981. ECF No. 32 ¶¶ 137–150; ECF No. 49, at 1–2; ECF No. 49-2, at 68, 92. Plaintiff's allegations primarily concern the conduct of her former supervisor Defendant Hernandez. ECF No. 32 ¶ 141; ECF No. 49, at 1–2.

Pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 46. The Motion has been fully briefed, and a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2025). Plaintiff has produced evidence creating a genuine dispute of material fact as to whether Defendants repeatedly and disproportionately scheduled Plaintiff for physically demanding shifts, often at the last minute, despite knowing that such scheduling

practices aggravated Plaintiff's wrist injury and Post Traumatic Stress Disorder. Plaintiff has further produced evidence that Defendants did so while readily accommodating Hispanic employees' scheduling requests. Plaintiff has thus met her burden to survive summary judgement as to her hostile-work-environment claim. Her racial-discrimination claim fails, however, because she fails to present any evidence that she was satisfactorily performing her job at the time of the asserted adverse employment action. Accordingly, for the reasons stated above and hereinafter, Defendants' Motion shall be granted, in part, and denied, in part.

## BACKGROUND

Plaintiff Heather Curran began working at Defendant MOM's Organic Market's College Park Store as an Operations Manager-in-Training on April 23, 2019. ECF No. 49-5 ¶ 6. At MOM's, Plaintiff's job duties included opening and/or closing the store, supervising MOM's Team Members (i.e., front-line employees) in all areas of the store, providing customer service, assisting in various store departments as needed, and other duties as assigned. ECF No. 46-8; ECF No. 46-5, at 35–39; ECF No. 49-5 ¶ 8. Plaintiff was also required to complete department-specific training through the "Manager-in-Training Program," which equipped Managers-in-Training for store leadership. ECF No. 46-8; ECF No. 46-24; ECF No. 49-5 ¶ 8. At the time, the MOM's College Park store had several departments, including produce, wellness, stocking, coolers, and the bakery. ECF No. 46-5, at 39. Managers-in-Training were expected to "work a flexible schedule that changes as the business changes" and maintain "flexibility with store assignments." ECF No. 46-8; ECF No. 46-5, at 35–36.

Defendant Hernandez—a Hispanic woman—was the General Manager of the College Park MOM's during Plaintiff's time working there, from April 2019 until February 2020. ECF No.

49-5 ¶¶ 2, 3 6. As General Manager, Defendant Hernandez supervised all the store's employees, including Plaintiff. *Id.* at ¶¶ 2, 13. Throughout the relevant period, Defendant Hernandez had authority over employment decisions including hiring, firing, employee discipline, and employee hours and assignments. ECF No. 46-9 ¶ 14; ECF No. 32 ¶ 17.

Plaintiff alleges that during her time at MOM's, Defendant Hernandez was "less critical of Hispanic employees" and that Hispanic employees were generally "given preferential treatment." ECF No. 49-2, at 92–96, 103. For example, Plaintiff asserts that a Hispanic produce manager named Frank[1] "received lax disciplinary actions" after "harassment allegations" were made against him, while Plaintiff "faced escalating scrutiny." ECF No. 49, at 8; ECF No. 46-15, at 9; ECF No. 46-5, at 92– 93. Plaintiff asserts that Defendant Hernandez provided emotional support to a Hispanic Team Member named Ingrid during family difficulties, while she treated Plaintiff coldly. ECF No. 49, at 8; ECF No. 46-15, at 8–9; ECF No. 49-2, at 73, 95. As detailed further below, Plaintiff also asserts that Defendant Hernandez scheduled Hispanic employees to work more desirable shifts. Relatedly, sometime between late June and early December 2019, Defendant Hernandez learned that Plaintiff was romantically involved with a Black man—whom Plaintiff married in December 2019—and Defendant Hernandez responded with "surprise[] that as a white woman [Plaintiff] was with a Black man." ECF No. 46-5, at 67–68.

On June 10, 2019, Plaintiff's father passed away. ECF No. 49-5 ¶ 26. Prior to her father's passing, Plaintiff discovered his unconscious body and attempted to perform CPR on him. *Id.* In doing so, Plaintiff injured her wrist. *Id.* That same day, Plaintiff informed MOM's via

[1] Plaintiff inconsistently uses various surnames for the Hispanic employees referred to throughout her filings. *See* ECF No. 46-1, at 22 n.19. This opinion thus uses first names for consistency with the record.

email that her father had passed and that she needed to take leave from work. ECR No. 46-11. Defendant Hernandez relayed this information to the store's Operations and Leadership teams. ECR No. 49-5 ¶ 28; ECR No. 46-12. During Plaintiff's time off, Plaintiff and Defendant Hernandez exchanged text messages: Plaintiff stated she would need ten days off; Defendant Hernandez replied asking where MOM's could send flowers; and Plaintiff explained that her family was requesting charitable donations rather than flowers. ECF No. 49-2, at 74–75. Plaintiff returned to work on June 20, 2019. *Id.* at 74. Defendant Hernandez had not informed other MOM's employees about the circumstances of Plaintiff's absence. ECF No. 49-5 ¶ 28; ECF No. 49-2, at 73. As a result, Plaintiff's colleagues asked Plaintiff about her "vacation," which she says "humiliated" her. ECF No. 49-5 ¶ 28; ECF No. 49-2, at 73; ECF No. 46-15, at 22. It is unclear when Plaintiff first informed Defendant Hernandez of her wrist injury. ECF No. 50-1 ¶ 84.[2]

Because Plaintiff had not yet worked at MOM's for 90 days when her father passed away, she was ineligible for general paid time off. ECF No. 49-2, at 131. Aware of this, Plaintiff took her ten days off as unpaid leave. *Id.* at 131, 143–144. Plaintiff did not realize that, under the bereavement-leave policy at MOM's, she was eligible for three days of paid bereavement leave. *Id.* at 143; ECF No. 49-3, at 98. While Plaintiff received the policy at the start of her employment with MOM's, ECF No. 46-5, at 31–35; ECF No. 46-3, at 10, Defendants did not remind Plaintiff of the policy after Plaintiff's father passed, ECF No. 49-2, at 131. Plaintiff alleges that Defendant

[2] Plaintiff asserts—without pointing to any evidence in support—that she informed Defendant Hernandez of her wrist injury immediately upon returning to work. ECF No. 49-5 ¶ 27; ECF No. 50-1 ¶ 84.

Hernandez did not tell non-Hispanic employees about the bereavement policy. ECF No. 46-15, at 11.

Around the time Plaintiff returned to work, Defendant Hernandez began assigning Plaintiff to training shifts in the bakery. ECF No. 49-5 ¶ 23; ECF No. 49-2, at 126–127. Bakery shifts were difficult. They began at 4:00 a.m. and involved physically taxing work such as kneading, which aggravated Plaintiff's wrist injury. ECF No. 49-2, at 113, 123. Defendants assert that Plaintiff was staffed to bakery shifts because of a staffing shortage and because Plaintiff had a background and personal interest in baking, having previously attended bakery and pastry school. ECF No. 46-2 ¶ 24; ECF No. 46-9 ¶ 16; ECF No. 49-2, at 120–121. Plaintiff admits she "love[s] to bake" and aspires to open a bakery of her own. ECF No. 49-2, at 120–121. Moreover, Defendants assert that the bakery was "particularly hard to staff" because the individual responsible for bakery training worked at multiple stores. ECF No. 46-9 ¶ 17. While Plaintiff acknowledges that Defendant Hernandez initially assigned Plaintiff to bakery training shifts because of Plaintiff's "previous experience" in baking, ECF No. 49-2, at 120–121, Plaintiff alleges that the bakery shifts "became a source of physical injury and discrimination" and that no other Managers-in-Training were assigned comparable bakery responsibilities. ECF No. 49-5 ¶¶ 9, 24; ECF No. 49-3, at 65–66.

Plaintiff asserts that, between June 2019 and February 2020, she was disproportionately assigned to bakery shifts over Hispanic employees and more frequently than was appropriate for a Manager-in-Training. ECF No. 46-15, at 12–14; ECF No. 49-5 ¶ 9; ECF No. 50-1 ¶¶ 78–79; ECF No. 49-2, at 95–96, 103. She also asserts that she was disproportionately scheduled for last-minute bakery shifts and that Defendant Hernandez sometimes called Plaintiff late at night about

shift coverage for the next morning. ECF No. 49-5 ¶ 34. During periods in which MOM's had difficulty filling bakery shifts, Plaintiff asserts that once or twice per week, Defendant Hernandez changed Plaintiff's work shifts from the times originally scheduled. ECF No. 46-5, at 126. Approximately once every two weeks, Defendant Hernandez called Plaintiff around 9:00 or 10:00 p.m. asking her to report for a 4:00 a.m. bakery shift. ECF No. 46-5, at 127–129; ECF No. 49-5 ¶ 34. Plaintiff asserts that, on at least two occasions, Defendant Hernandez called Plaintiff around 2:00 a.m. for a 4:00 a.m. bakery shift. ECF No. 46-5, at 128–129. Plaintiff testified that she "was reprimanded if [she] was not available" to answer Defendant Hernandez's calls at 2:00 a.m. *Id.*

Plaintiff alleges that Hispanic employees were generally not called upon to cover last-minute bakery shifts; further, Plaintiff testified that "Defendant Hernandez would instruct Plaintiff to call on the non-Hispanic employees for bakery call-outs." ECF No. 49, at 8; ECF No. 46-15, at 12–13. Plaintiff points to specific examples of disparate scheduling treatment. She testified that a Hispanic Team Member named Ana was excused from bakery shifts while pregnant and that a Hispanic Manager-in-Training—also named Heather—was not required to train in the bakery despite having more experience than Plaintiff. ECF No. 46-15, at 9, 13, 20–21; ECF No. 46-5, at 103–107. Plaintiff testified that other Hispanic employees—including employees named Lorena, Betty, and Frank—were "scheduled in [their] preferred departments," were "given their requested shifts," and "had their schedule adjusted for family reasons with little to no difficulty." ECF No. 46-15, at 24–25. Plaintiff also asserts that Defendant Hernandez generally allowed Ingrid more flexibility in shift assignments than other employees.[3] ECF No. 46-5, at 102.

[3] Ingrid was a minor at all relevant times, which Plaintiff acknowledges "impacted some of how

In September 2019, after obtaining health insurance through MOM's, Plaintiff sought medical treatment for her wrist injury, apparently for the first time. ECF No. 49-5 ¶ 32; ECF No. 49-2, at 90, 179; ECF No. 46-5, at 180–183. Plaintiff received a doctor's note requesting two weeks off from bakery duty and submitted it to MOM's. ECF No. 46-5, at 180–182. Defendants complied with the doctor's note, and after a two-week break from bakery shifts, Plaintiff's wrist "fe[lt] better." *Id.* However, when Plaintiff returned to bakery duty, she reinjured it. *Id.* at 182. Plaintiff testified that at some point, she submitted a second doctor's note requesting time away from the bakery, after which Defendant Hernandez continued scheduling Plaintiff for bakery shifts. ECF No. 49-2, at 123–124. Defendants assert that Plaintiff volunteered for at least one bakery shift in the weeks following the second doctor's note, ECF No. 46-2, at ¶ 33 (citing ECF No. 46-5, at 116; ECF No. 46-14), but Plaintiff disputes Defendants' characterization and states she was "pressed into saying yes." ECF No. 49-5 ¶ 33 (quoting ECF No. 49-2, at 126). In September 2019, Plaintiff visited a therapist who diagnosed her with Post-Traumatic Stress Disorder resulting from her father's death and other past traumatic experiences. ECF No. 50-1 ¶ 88; ECF No. 49-2, at 169–170. Plaintiff states that Defendants' last-minute scheduling practices heightened her anxiety, impeded her sleep, and created an overall sense of instability, thus exacerbating her PTSD symptoms. ECF No. 46-15, at 26 (citing ECF No. 32 ¶ 49).

In November 2019, Plaintiff learned from a MOM's Team Member that MOM's employees were eligible for bereavement leave. ECF No. 49-2, at 130–131. She then exchanged emails with the Human Resources Department at MOM's, requesting a leave of absence to mourn the "loss of several close family members and friends, including [her] father." ECF No. 49-5 ¶

---

Mom's could staff her." ECF No. 46-5, at 102.

48. A MOM's HR Analyst explained that Plaintiff was eligible for three days of leave for her father's passing, to which Plaintiff replied, "[T]hree days will be perfect." ECF No. 46-7.

Plaintiff testified that, after her father's passing, she experienced "months of being given very, very vague feedback that [she] needed to do better with no specifics." ECF No. 46-5, at 63. She asserts that, in the months after her father's passing, Defendant Hernandez repeatedly told her she needed to be more "positive" and that if she "wasn't as positive as [she] had been when [she] was first hired," she "was going to be demoted" or face other "repercussions." ECF No. 49-2, at 138–141. In January 2020, Defendant Hernandez placed Plaintiff on a performance improvement plan called "Pathway to Success" (PTS).[4] ECF No. 46-5, at 58–63. Plaintiff alleges that the PTS meeting was conducted with Defendant Hernandez only, in violation of a MOM's policy requiring two managers to be present for all disciplinary conversations.[5] ECF No. 50-1 ¶ 94. The parties dispute the precise contours of the PTS. According to Defendants, it included specific areas for improvement, including Plaintiff's "inconsistency" and her "inability to lead the team and get things done within the time frames that she needed to get them done." ECF No. 46-4, at 121–122. Plaintiff asserts that the PTS included only vague criticisms. ECF No. 49-5 ¶ 57. According to Plaintiff, Defendant Hernandez stated that "she did not want to have to fire [Plaintiff],

---

[4] Defendants dispute the characterization of a PTS as a "performance improvement plan" and instead use the phrase "performance management system." *Compare* ECF No. 50-1 ¶ 93, *with* ECF No. 46-2 ¶ 56. Both parties cut off their excerpts of Defendant Hernandez's deposition transcript in the middle of Defendant Hernandez's apparent explanation of the relevant difference. ECF No. 46-4, at 112; ECF No. 49-3, at 112.

[5] Plaintiff has not introduced a copy of this policy. ECF No. 50-1 ¶ 94. In support of her assertion, Plaintiff explained at deposition that she was trained to have another manager present in any disciplinary conversations that *she*—a Manager-in-Training—had with other employees. ECF No. 46-5, at 63–64. Plaintiff does not provide a specific basis for applying this policy to Defendant Hernandez, the store's General Manager.

and so [Plaintiff] should step down" to a less stressful role. ECF No. 46-5, at 66. Nonetheless, Defendants did not demote Plaintiff during the PTS meeting; as a result, Plaintiff understood that she had 90 days to improve her performance and thus avoid demotion. *Id.* at 66–67.

Plaintiff asserts that Defendant Hernandez's criticism was unwarranted, pointing to compliments Plaintiff allegedly received from colleagues. ECF No. 49, at 5; ECF No. 46-15, at 6–7. For example, in September 2019, a more experienced Manager-in-Training, Josh Newman, complimented Plaintiff's work ethic and customer service. ECF No. 49, at 5; ECF No. 49-2, at 54; ECF No. 46-15, at 7. None of the specific compliments Plaintiff identifies occurred after September 2019. ECF No. 49-5 ¶¶ 55, 72; ECF No. 49-2, at 58–60.

On February 7, 2020, Plaintiff's therapist provided a letter requesting workplace accommodations for Plaintiff's PTSD, including a more consistent work schedule. ECF No. 49-2, at 173–174. Plaintiff alleges that the workplace conditions at MOM's aggravated her PTSD such that she "was regularly physically sick or unable to eat at work." ECF No. 46-15, at 28–29. At some point thereafter, Plaintiff submitted her therapist's letter requesting an accommodation to MOM's, but, as Defendants concede, there was "[n]ot much of a change" in response to the letter. ECF No. 50-1 ¶ 91; ECF No. 49-2, at 174. Accordingly, Plaintiff's schedule remained inconsistent. ECF No. 49-2, at 174. According to Plaintiff, Defendant Hernandez regularly accommodated schedule changes for Hispanic employees but told Plaintiff that "her accommodation would never happen at . . . MOM's."[6] ECF No. 46-15, at 24–27. After securing employment elsewhere with the same pay, Plaintiff tendered her resignation on or about February

---

[6] It is not clear which accommodation request Defendant Hernandez was allegedly responding to. *See* ECF No. 46-15, at 27.

21, 2020. ECF No. 49-2, at 134, 174; ECF No. 46-28. She explained to a colleague that she felt she would likely be demoted and that she could not afford to take a pay cut. ECF No. 49-2, at 134.

On February 9, 2024, Plaintiff filed a Complaint against Defendant Hernandez and Defendant MOM's alleging race discrimination, retaliation, and hostile work environment in violation of 42 U.S.C. § 1981. ECF No. 1. Defendants filed a Motion to Dismiss on May 3, 2024. ECF No. 15. On December 2, 2024, the Court granted Defendants' Motion to Dismiss as to Plaintiff's retaliation claim and denied the Motion as to Plaintiff's hostile-work-environment and race-discrimination claims. ECF No. 29. On December 23, 2024, Plaintiff filed an Amended Complaint alleging race discrimination and hostile work environment, ECF No. 32, and Defendants filed an Answer on January 14, 2025, ECF No. 33. The parties conducted discovery, and on February 20, 2026, Defendants moved for summary judgment. ECF No. 46.

**STANDARD OF REVIEW**

The Court will only grant a motion for summary judgment where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The party moving for summary judgment bears the burden of showing that there are no

genuine issues of material fact. Fed. R. Civ. P. 56(a); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).[7]

## DISCUSSION

Section 1981 "prohibits discrimination in employment on the basis of race." *Evans v. Md.-Nat'l Cap. Parks & Plan. Comm'n*, No. 19-CV-2651, 2023 WL 3328002, at *17 (D. Md. Mar. 31, 2023) (quoting *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551–52 (4th Cir. 2006)), *aff'd per curiam*, No. 23-1475, 2023 WL 8064797 (4th Cir. Nov. 21, 2023). Under § 1981, a plaintiff may bring "race-based disparate treatment and/or hostile environment claims." *Proa v. NRT Mid Atl., Inc.*, 618 F. Supp. 2d 447, 461 (D. Md. 2009), *aff'd per curiam*, 398 F. App'x 882 (4th Cir. 2010) (unpublished). Though § 1981 claims and Title VII claims rest on "distinct legal theories," courts apply the same analysis to employment-based claims under both statutes. *Id.* (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985)); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001) (explaining that the elements of a hostile work environment claim "are the same under either § 1981 or Title VII"); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir. 2002) ("The required elements of a prima facie case of employment discrimination are the same under Title VII and Section 1981.").

---

[7] Citing *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996), and *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), Plaintiff argues that "Courts must exercise 'an extra measure of caution' when considering summary judgment in employment discrimination cases 'because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions.'" ECF No. 49, at 6. Wise as that principle may or may not be, the language Plaintiff places in quotation marks does not appear in the cited cases. *See also* ECF No. 49, at 12–13 (misquoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003).

Defendants move for summary judgment on both Plaintiff's hostile-work-environment claim (Count II) and her race-discrimination claim (Count I). As to the hostile work environment claim, Defendants make two main arguments. First, they argue that Plaintiff did not experience unwelcome conduct on the basis of her race. Second, they argue that Plaintiff did not experience sufficiently "severe or pervasive" conduct to create a hostile work environment. Because Plaintiff has created genuine disputes of material facts as to each element of her hostile-work-environment claim, Defendants' Motion is denied as to Count II. As to Plaintiff's race discrimination claim, Defendants correctly argue that Plaintiff has not established a prima facie case of racial discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**I. Hostile Work Environment**

"A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A hostile-work-environment claim "may involve incidents that occur over the course of 'a series of days or perhaps years.'" *Taylor v. Go-Getters, Inc*, No. 20-CV-3624, 2021 WL 5840956, at *12 (D. Md. Dec. 9, 2021) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). Further, as long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117.

To succeed on a hostile-work-environment claim, a plaintiff must show that she faced "(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (omission in original) (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). Defendants argue that Plaintiff has failed to establish the first three elements of this test. The Court will briefly address element one before turning to the more substantive second and third elements. Because the "severe or pervasive" element narrows the scope of this analysis, the Court will address it prior to determining whether any such conduct occurred based on Plaintiff's race.

**A. Unwelcome Conduct**

Plaintiff has readily satisfied the "unwelcome conduct" element of a hostile-work-environment claim. Defendants only briefly contest this point. ECF No. 46-1, at 5 n.6. The "unwelcome conduct" element is "not a high hurdle," and "an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer." *Strothers v. City of Laurel*, 895 F.3d 317, 328–29 (4th Cir. 2018). Plaintiff testified that she repeatedly voiced her objections to her workplace conditions, including through notes from her medical and mental-health-care providers. Plaintiff has thus cleared this low bar.

**B. Sufficiently Severe or Pervasive**

Plaintiff has also produced evidence sufficient to show that Defendants' conduct was "severe or pervasive" enough to create a hostile work environment. "The severe or pervasive element has both a subjective and objective component," requiring a plaintiff to show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile."

*Evans v. Int'l Paper Co*., 936 F.3d 183, 192 (4th Cir. 2019) (quoting *EEOC v. Cent. Wholesalers, Inc.,* 573 F.3d 167, 175 (4th Cir. 2009)); *see also Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 227 (4th Cir. 2016). Defendants focus their arguments solely on the objective inquiry. ECF No. 46-1, at 10–13.

To understand whether alleged harassment is "objectively 'severe or pervasive,'" courts "look 'at all the circumstances.'" *Int'l Paper Co.*, 936 F.3d at 192 (quoting *EEOC v. Sunbelt Rentals, Inc*., 521 F.3d 306, 315 (4th Cir. 2008)). This includes assessing the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23). "[I]ncidents that would objectively give rise to bruised or wounded feelings," "rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not" sufficient to demonstrate severe or pervasive harassing conduct. *Int'l Paper Co.*, 936 F.3d at 192 (alteration in original) (quoting *Sunbelt Rentals*, 521 F.3d at 315). To demonstrate the "severe or pervasive" element of a hostile-work-environment claim, a "plaintiff may, but is not required to, establish that the environment is 'psychologically injurious.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Additionally, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor." *Taylor*, 2021 WL 5840956, at *12 (quoting *Boyer-Liberto*, 786 F.3d at 278).

In contesting the severity and pervasiveness of Plaintiff's experience, Defendants advance two main arguments. First, Defendants attack the evidentiary basis for many of the allegations in Plaintiff's Amended Complaint and her Opposition to Summary Judgment, asserting that the

allegations are speculative, conclusory, or contradicted by record evidence. ECF No. 46-1, at 11–12. Second, Defendants characterize Plaintiff's remaining allegations as "routine" workplace events that do not rise to the level of a hostile work environment. *Id.* At 12–13.

To be sure, some of the allegations in Plaintiff's Amended Complaint and her Opposition to Summary Judgment are conclusory, speculative, or contradicted by the record. For example, Plaintiff's assertion that Defendant Hernandez "deliberately withheld" information about MOM's bereavement-leave policy is based entirely on her speculation. ECF No. 49, at 4. While Plaintiff asserts in her Amended Complaint and Opposition that she received late-night scheduling calls "two to three times per week," ECF No. 32 ¶ 122; ECF No. 49, at 4, Plaintiff testified at her deposition that such calls in fact occurred approximately once every two weeks, ECF No. 46-5, at 127–129; ECF No. 49-5 ¶ 34.

Moreover, some of Plaintiff's other contentions are merely "grievances about 'the management style or decisions of those who supervised' her," and thus, are not severe or pervasive enough to establish a hostile work environment. *Wooten v. Univ. of Md.*, 733 F. Supp. 3d 402, 428 (D. Md. 2024) (quoting *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 601 (D. Md. 2011)). For example, Plaintiff asserts that Defendant Hernandez should have notified MOM's employees of Plaintiff's father's passing, but a reasonable employee in Plaintiff's position may have preferred privacy over such matters. Similarly, Plaintiff may have wished that Defendant Hernandez had offered Plaintiff "hugs and consistent emotional support" following her father's passing, ECF No. 49, at 8, but this too amounts to a concern about "management style." Finally, the fact Defendants assigned Plaintiff bakery duty does not, on its own, establish a hostile work environment. *Combs-Burge v. Rumsfeld*, 170 F. App'x 856, 862 (4th Cir. 2006) (holding that "assigning individuals to

difficult jobs" does not create a hostile work environment). The parties agree that at least *some* bakery duty was consistent with Plaintiff's job description. ECF No. 49-5 ¶ 9. Additionally, Plaintiff professed a love for baking and aspirations to open a bakery of her own, making her assignment to some bakery duty objectively reasonable.

Nevertheless, Plaintiff has developed a record that plausibly supports the "severe or pervasive" element. Plaintiff points to evidence sufficient to show that Defendant Hernandez scheduled Plaintiff for bakery duty more frequently than was appropriate for a Manager-in-Training, despite knowing—at least, eventually—that these shifts aggravated Plaintiff's wrist injury. While the parties agree that Defendants gave Plaintiff two weeks off from bakery duty following her first doctor's note, Plaintiff testified that her second doctor's note was ignored and that she continued to be assigned or pressured into accepting bakery shifts. Similarly, Plaintiff testified that Defendants subjected her to especially chaotic scheduling practices—including late-night phone calls, at least once every two weeks—even after she provided Defendant Hernandez documentation that such practices exacerbated Plaintiff's PTSD symptoms. Moreover, while Defendant Hernandez may have called Plaintiff at 2:00 a.m. on just two occasions, Defendant Hernandez allegedly reprimanded Plaintiff if she was not available to answer the phone at 2:00 a.m. Plaintiff states that these practices caused her extreme anxiety, poor sleep, and an overall sense of instability. Although MOM's Managers-in-Training were required to work a flexible schedule, Plaintiff testified that Defendants required her to accommodate a level of flexibility that went well beyond that expected of her colleagues. These scheduling practices took place against a backdrop of Defendant Hernandez repeatedly criticizing Plaintiff's lack of "positivity" following her father's passing.

A reasonable jury could conclude that these practices were sufficiently severe or pervasive to create a hostile work environment. While scheduling disputes ordinarily do not create a hostile work environment, *see, e.g.*, *Wooten*, 733 F. Supp. 3d at 428–29, a plaintiff's particular circumstances can heighten the significance of the schedule. For example, in *Strothers*, the Fourth Circuit determined that a ten-minute change in an employee's required arrival time supported a hostile-work-environment claim because the plaintiff there had specifically negotiated her arrival time to account for childcare responsibilities. 895 F.3d at 331–32. Here, Plaintiff's wrist injury and PTSD provide additional context for her scheduling concerns. She was not merely subjected to inconvenience—she testified that her chaotically scheduled bakery shifts caused her physical and psychological harm. Such harms are quintessential indicators of a hostile work environment. *See Boyer-Liberto*, 786 F.3d at 277; *Harris*, 510 U.S. at 23. The source of the alleged harassment—Defendant Hernandez—is also significant. "Simply put, 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'" *Boyer-Liberto*, 786 F.3d at 278 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)). Given the threatening nature of Defendant Hernandez's scheduling practices, the fear of missing a late-night call could have caused "a reasonable person in [Plaintiff's] position," *id.* at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)), to lose sleep and feel anxious, even on nights when that fear did not materialize.

Defendants incorrectly insist that Plaintiff's invocation of her wrist injury and PTSD are immaterial because this is not a disability discrimination case. Workplace harms are not automatically irrelevant to a race-based hostile-work-environment claim merely because those harms also implicate some other employee characteristic. The question—addressed below—is

whether those harms were inflicted *because of race*. The court's decision in *Strothers* is again illustrative. There, the plaintiff's schedule change implicated her status as a mother and caregiver. Even so, she successfully argued that her schedule was hostilely changed *because of her race* as opposed to, for example, her status as a mother. *Strothers*, 895 F.3d at 329–332.

**C. Because of Plaintiff's Race**

Plaintiff has testified to facts sufficient to support an inference that Defendants' conduct was based on Plaintiff's race. The Court may "infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races." *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 409 (4th Cir. 2022). To survive summary judgement using this inferential approach, "[g]eneral allegations of differential treatment must be substantiated by 'accounts of specific dates, times or circumstances.'" *Cepada v. Bd. of Educ.*, 974 F. Supp. 2d 772, 784 (D. Md. 2013) (quoting *Carter v. Ball*, 33 F.3d 450, 461 (4th Cir. 1994)). While Plaintiff's evidence could provide more detail as to timing, she points to circumstances specific enough to survive summary judgment.

Plaintiff has identified specific instances of Hispanic employees receiving relevant favorable treatment. Plaintiff testified that Defendant Hernandez readily accommodated schedule changes for a Hispanic employee, Ana, during her pregnancy—including by removing Ana from bakery duty—while refusing to accommodate Plaintiff's wrist injury and PTSD. Plaintiff also testified that Defendants did not ask Hispanic employees to cover last-minute bakery shifts despite the fact that: 1) at least some Hispanic employees were trained to do so; and 2) other Hispanic employees' job descriptions included such responsibilities. Plaintiff identified at least some of these Hispanic employees by name. While some scheduling conversations were beyond

Plaintiff's personal knowledge, ECF No. 49-2, at 124, she testified that Defendant Hernandez "would instruct Plaintiff to call on the non-Hispanic employees for bakery call-outs." ECF No. 46-15, at 12–13. Finally, Defendants incorrectly assert that Plaintiff failed to identify "'specific dates, times or circumstances' when she was asked to work in the Bakery department without prior notice." ECF No. 46-1, at 9 (quoting *Ramsey v. Dep't of Veterans Affs.*, No. 12-CV-2375, 2013 WL 6154191, at *4 (D. Md. Nov. 21, 2013)). Plaintiff may have failed to identify specific *dates*, but she did identify specific times—9:00 p.m. to 10:00 p.m., and twice at 2:00 a.m.—and circumstances—Defendants reprimanded her if she was not available to speak at 2:00 a.m.

Plaintiff's evidence is far more specific than the speculative, general allegations at issue in the cases Defendants rely upon. *See* ECF No. 46-1, at 9–10. For example, in *Cepada*, a Black teacher sought to support his race-based hostile-work-environment claim by pointing to the differential treatment of white teachers with respect their student-discipline practices. 974 F. Supp. 2d at 785–86. However, the plaintiff-teacher did not "provide[] any evidence of instances in which a white teacher's discipline of a student was upheld, while [plaintiff's] discipline of a student was not." *Id.* at 785. Thus, the plaintiff did not adequately "substantiate[] his claims with dates, times, or circumstances." *Id.* By contrast, Plaintiff has pointed to specific circumstances in which Hispanic employees received favorable scheduling treatment.

Plaintiff's evidence of differential treatment is buttressed by Defendant Hernandez's comment expressing surprise at Plaintiff's romantic relationship with a Black man. While such isolated comments may not, on their own, satisfy the "severe or pervasive" element, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), they can provide an additional basis from which

a jury could infer that conduct was based on race, *see Strothers*, 895 F.3d at 330–31 ("[T]he connection between animus and conduct may be inferred from the totality of the circumstances.").

Plaintiff has thus established a genuine dispute of material fact as to each of the three contested elements of a hostile-work-environment claim. Accordingly, Defendants' Motion for Summary Judgment on that claim is denied.

**II. Race Discrimination**

Plaintiff also asserts that Defendants violated § 1981 by placing her on a PTS and constructively discharging her because of her race. Plaintiff has not put forward direct evidence of racial discrimination and instead argues the Court may infer racial discrimination from her circumstances. ECF No. 49, at 8. "Without direct evidence of intentional discrimination, a plaintiff may use the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to develop an inferential case of discriminatory intent." *Lyons v. City of Alexandria*, 35 F.4th 285, 289 (4th Cir. 2022). Under that framework, Plaintiff must first "establish a prima facie case of racial discrimination." *Id.* To establish a prima facie case of discrimination, Plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] job and [her] job performance was satisfactory; (3) [s]he suffered an adverse employment action; and (4) [s]he was treated differently than similarly situated employees outside [her] protected class." *Frank v. England*, 313 F. Supp. 2d 532, 538 (D. Md. 2004).

Defendants argue that Plaintiff's job performance was unsatisfactory, that she did not suffer an adverse employment action, and that she was not treated differently than similarly situated Hispanic employees. The Court will first address the timeliness of Plaintiff's adverse-employment-action claims before turning to Plaintiff's prima facie discrimination case. As

explained below, Plaintiff has not demonstrated that her performance was satisfactory at the time of a properly asserted adverse employment action and has therefore not established a prima facie discrimination case. Thus, the Court need not analyze the remaining elements of the *McDonnell Douglas* framework.

**A. Timeliness**

As explained in the Court's opinion on Defendants' Motion to Dismiss, ECF No. 29, at 14–15, employment-discrimination claims under § 1981 are governed by a four-year federal statute of limitations. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 291–92 (4th Cir. 2004). Because Plaintiff filed her Complaint on February 9, 2024, she "can only file a charge to cover discrete acts that 'occurred'" after February 9, 2020. *Holland v. Wash. Homes, Inc*., 487 F.3d 208, 220 (4th Cir. 2007) (quoting *Morgan*, 536 U.S. at 114).

Nevertheless, Plaintiff argues that her placement on a PTS in January 2020 qualifies as "a clear adverse action occurring within the limitations period." ECF No. 49, at 9. Plaintiff does not explain her assertion that this action, which occurred prior to February 8, 2020, is not time-barred. The January 2020 PTS is a "discrete act[] . . . that occur[red] outside the statutory time period," and thus, cannot qualify as an adverse employment action. *Morgan*, 536 U.S. at 105.

Accordingly, the Court will only analyze Plaintiff's constructive-discharge claim, which is premised on her February 21, 2020 resignation. *See Guessous*, 828 F.3d at 223 ("[T]he employee's resignation is the culmination of the intolerable discriminatory conduct of the employer, such that the relevant limitation period starts with the employee's resignation, not the last act of the employer.").

**B. Satisfactory Job Performance**

Plaintiff must produce evidence that shows she "was meeting [her] employer's legitimate expectations at the time [she] was" constructively discharged. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006). While "co-workers' opinions might be relevant in certain situations," it is ultimately "the perception of the decision maker which is relevant." *Id.* (first citing *King v. Rumsfeld*, 328 F.3d 145, 149–50 (4th Cir. 2003); and then quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)).

Defendants have presented unrebutted evidence that Plaintiff's job performance was unsatisfactory at the time of her resignation in February 2020. Defendant Hernandez testified that Plaintiff was placed on a PTS due to her inconsistency, poor leadership, and failure to complete tasks on time. ECF No. 46-4, at 121–122. Defendant Hernandez specifically testified that Plaintiff struggled with closing the store. *Id.* In response, Plaintiff generally alludes to "competent evidence" establishing that her job performance was satisfactory. ECF No. 49, at 9.

While the record does contain various compliments from co-workers about Plaintiff's performance during her time at MOM's, these compliments are not sufficient to establish satisfactory performance at the time of Plaintiff's alleged constructive discharge. The only specific compliments that appear in the record occurred several months *prior* to Plaintiff's resignation and came from colleagues who were not responsible for reviewing Plaintiff's overall performance. "The further back in time a court goes to evaluate an employee's performance, the more removed the evidence is from the time of the termination," and thus, the inference of unlawful discrimination "obviously decreases as the time gap between last proven satisfactory performance and challenged employment action lengthens." *Warch*, 435 F.3d at 516 (quoting *Lovelace v.*

*Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982)). Accordingly, in *Warch*, the Fourth Circuit explained that compliments from co-workers whose employment ended well before plaintiff's were not probative of the employer's legitimate expectations at the time plaintiff was fired. *Id.* at 518.

The compliments on which Plaintiff relies in this case are similar to those in *Warch*. In deciding Defendants' Motion to Dismiss, the Court placed significant weight on a compliment that Manager-in-Training Newman allegedly gave to Plaintiff. ECF No. 29, at 19–20. The Court reasoned that, "while the Complaint does not state exactly when Plaintiff spoke with Manager-in-Training Newman, the Court can reasonably infer that Plaintiff sought Manager-in-Training Newman's feedback following her January 2020 disciplinary discussion with Defendant Hernandez." *Id.* at 20. The undisputed evidence now shows that this conversation took place in September 2019, five months prior to Plaintiff's resignation. ECF No. 49, at 5. Around that same time, Plaintiff allegedly received a compliment from Assistant General Manager Brian Burns, who did not directly supervise Plaintiff and with whom Plaintiff "didn't work with . . . super frequently." ECF No. 46-5, at 46, 54–55; ECF No. 49-5 ¶¶ 16, 60. The remaining compliments for which Plaintiff identifies a specific timeframe took place during the first two months of her employment. These came from department managers who provided limited supervision over Plaintiff within their own departments but were not responsible for reviewing Plaintiff's overall performance or dictating the state of Plaintiff's employment. ECF No. 49-2, at 51–52.

Plaintiff's evidence of compliments from non-decisionmakers is not probative of whether Plaintiff was performing satisfactorily five or more months later. While five months might

sometimes be sufficiently contemporaneous to establish satisfactory performance, these five months must be viewed in the context of Plaintiff's relatively short overall employment and Plaintiff's allegedly inconsistent performance during that time. *See, e.g.*, *Lovelace*, 681 F.2d, at 244 (applying "common experience" to the "full record" when assessing satisfactory performance); *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995) (citing *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir. 1992) (observing that, in *Anderson*, "a pay raise given at the start of 1985 was not" relevant "to a discharge on May 1, 1985"), *rev'd on other grounds*, 517 U.S. 308 (1996). The fact that these compliments came from non-decisionmakers further undercuts their probative value. To be sure, the opinions of peers and other non-decisionmaking colleagues may sometimes be probative of an employer's legitimate expectations. *See Warch*, 435 F.3d at 518 (citing *King*, 328 F.3d at 149–50). However, in this case, the compliments in the record primarily came from colleagues with limited exposure to Plaintiff's work. Thus, the record does not contain evidence from which a reasonable jury could conclude that Plaintiff was performing satisfactorily at the time of her alleged constructive discharge. Because Plaintiff has not demonstrated this essential element of a prima facie discrimination case, the Court need not address the remaining elements of her race-discrimination claim.

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgement, ECF No. 46, is denied as to Count II (hostile work environment) and granted as to Count I (race discrimination). The parties shall provide a Joint Status Report within fourteen days whether they would like referral to another U.S. Magistrate Judge of thus Court for a settlement conference.

So ordered.

Date: September 29, 2026

/s/
Ajmel A. Quereshi
United States Magistrate Judge